IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| Twin K Construction, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | No. 21-cv-74 |
| | ) | |
| vs. | ) | |
| | ) | |
| UMA, Geotechnical Construction, Inc. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## COMPLAINT

COMES now into Court, the Plaintiff, by and through counsel, and for its cause of action states as follows:

### I. THE PARTIES

1. Plaintiff Twin K Construction, Inc. (hereinafter "**Twin K**") is a Tennessee corporation with a principal place of business at 13271 Scott Hwy, Helenwood, Scott County, Tennessee, 37755.

2. Defendant UMA, Geotechnical Construction, Inc. (hereinafter "**UMA**") is a North Carolina corporation with a principal place of business at 8815 Neville Rd., Colfax, North Carolina, 27235. UMA's registered agent for service of process is James DeSpain who may be found at 8815 Neville Rd., Colfax, North Carolina, 27235.

### II. JURISDICTION & VENUE

3. On September 26, 2019, Twin K and UMA (collectively the "**Parties**") entered into a construction subcontract in Tennessee for work to be performed in

1

Tennessee (hereinafter the "**Subcontract**"). A copy of the Subcontract is provided as **Attachment 3** hereto. The Subcontract at Section 29 states Tennessee law applies to the Subcontract. The Parties are corporate citizens of different states and have principal places of businesses in different states. The amount in controversy, as set forth below, exceeds $75,000 exclusive of interest and costs. This Court has original jurisdiction pursuant to 28 USC § 1332(a)(1) and (c)(1) (diversity).

4. This Court is a proper venue pursuant to 28 USC § 1391(b)(2) (venue) because the Subcontract was (1) entered into in Scott County, Tennessee (see paragraph 11), (2) the $84,993.78 remaining Subcontract Retainage Twin K is withholding from UMA at issue in this case (see paragraph 32) is located in Scott County, Tennessee, and (3) Scott County, Tennessee is located in the Eastern District of Tennessee.

### III. FACTS

5. Twin K is a construction general contractor primarily doing road and bridge construction, road stabilization, paving, building retaining walls, and performing related work primarily for the Tennessee Department of Transportation (hereinafter "**TDOT**") and other Tennessee counties and municipalities.

6. On July 12, 2019, Twin K was awarded a general contract from TDOT to provide emergency slope stabilization on US-70(SR-1) (hereinafter the "**Highway**") in Cumberland County, Tennessee (hereinafter the "**Project**"). Basically, portions of the Highway traversing a hillside washed out during heavy rains occurring in February 2019

closing traffic from two lanes to just one lane in that area. TDOT's reference number for the Project was CNT234.

7. TDOT prepared the contract (hereinafter the "**Prime Contract**") to be bid as an "emergency contract" with all work to be completed by November 15, 2019 (the "**Initial Completion Date**"). The initial Prime Contract price for the Project was $3,923,810.06.[1] Twin K was issued a notice to proceed on July 26, 2019, and so Twin K had just 112 days to finish the Project. For each day the Project was not completed after November 15, 2019, the Prime Contract provided that Twin K would be assessed $1,000 per day in liquidated damages.

8. The general plan for the Project was to have the general contractor, Twin K, cause to be designed and built two (2) walls on the downhill side of the Highway to provided lateral support for the Highway. The first wall was to be a sloped, 45º angle, soil-nail wall (the "**Primary Wall**"), and behind this wall, further down the slope, was to be placed a vertical wall (the "**Secondary Wall**") with the area behind the Secondary Wall backfilled with crushed stone. Both walls were to be approximately 400 feet long and 23 feet high.

9. The bid materials for the Prime Contract are public record and available to prospective general contractors as well as companies, such as UMA, interested in becoming a subcontractor to a general contractor awarded the Prime Contractor. TDOT

---

[1] The Prime Contract was a quantities contract, meaning Twin K would be paid based upon as-built unit pricing for what the Project ultimately required, which in the end could mean more money, or less money, ultimately paid in comparison to the estimated initial price.

3

publicizes the opportunity to bid on jobs via its website. Provided as **Attachment 1** hereto is the TDOT notification to bidders for the Project (the "**Notice to Bidders**"). The Project is mentioned on page 3 of the Notice to Bidders as Cumberland County contract number CNT234. Bids from general contractors for the Project were due June 21, 2019. The Notice to Bidders shows a completion date for the Project as November 15, 2019.

10. UMA is in the business of designing and building retaining walls such as the Primary and Secondary Walls. At some point prior to June 21, 2019, UMA saw the Notice to Bidders for this Project and located and reviewed the bid documents for the Project, thus becoming fully aware of the Project's scope and Initial Completion Date. On June 21, 2019, from its offices in Guilford County, North Carolina, UMA emailed Twin K, at its offices in Scott County, Tennessee, a solicitation to be a subcontractor to Twin K for the Project along with a price quote. Provided herewith as **Attachment 2** is a copy of UMA's June 21, 2019, solicitation/quote for the Project (CNT234). In that solicitation/quote, UMA represented, on page 2, bullet point 6, that "UMA has budgeted sufficient time to complete this project as described above."

11. The Parties ultimately agreed that UMA would receive a subcontract from Twin K for UMA to design and build both walls. On September 25, 2019, UMA at its offices in Guilford County, North Carolina executed the **Attachment 3** Subcontract and emailed it to Twin K at its offices in Scott County, Tennessee. Twin K printed the Subcontract and the next day, September 26, 2019, Twin K executed the Subcontract at

4

its offices in Scott County, Tennessee. Thus, on that date, the Subcontract was entered into in Scott County, Tennessee.

12. The value of the Subcontract at the time it was entered into was $2,273,850.00 based upon the estimated quantities for the Project.[2]

13. The Subcontract at Section 1, on page 1 (actually labeled "First") states that:

> All terms and conditions of the Prime Contract between the Owner [TDOT] and The Contractor [Twin K] are incorporated herein by reference and binding on the Subcontractor [UMA].

Section 7 (2) on page 4 of the Subcontract further states:

> The Subcontractor is bound to the Contractor by the terms of the Contract Documents [i. e. the Prime Contract] and assumes toward the Contractor [Twin K] with respect to the Subcontractor's work, all of the obligations and responsibilities that the contractor by the Contract Documents has assumed toward the Owner.

14. The provision of the Prime Contract establishing the completion date of November 15, 2019, is the cover page of the Prime Contract a/k/a the Proposal Contract, which page is copied and provided hereto as **Attachment 4**. The provision of the Prime Contract imposing upon Twin K the potential obligation for liquidated damages is TDOT's Standard Specification Section 108.09, a copy of which is provided hereto as **Attachment 5**. As the original Prime Contract price was between 2 million and 10

---

[2] As mentioned in the preceding footnote, what UMA would ultimately be paid under the Subcontract would depend upon the as-built quantities needed for the Project, which could be more or less than the estimated price for the Subcontract.

million dollars, this Standard Specification shows a daily rate of liquidated damages of $1,000 per day for failure to complete the Project on time.

15. Section 3 of the Subcontract, at page 2, further states that:

> Subcontractor [UMA] shall prosecute its work in a prompt and diligent manner in accordance with Contractor's [Twin K] Working Schedule, without delaying or hindering Contractor's work or the work of other contractors or subcontractors. Subcontractor [UMA] shall coordinate the work covered by this Agreement with that of other contractors, subcontractors and the Contractor [Twin K], in a manner that will facilitate the efficient completion of the entire work.

16. Accordingly, by virtue of the express terms of the Subcontract, **Attachment 4**, **Attachment 5**, and otherwise by law, UMA was to diligently prosecute its work under the Subcontract in such a manner as to not delay Project completion. Should UMA be responsible for not diligently prosecuting its work under the Subcontract, resulting in a delay of Project completion, and TDOT's assessment of liquidated damages to Twin K, UMA would be obligated to Twin K for said liquidated damages.

17. As mentioned, UMA's Subcontract was to design and build the two (2) retaining walls to provide lateral support for the Highway. This work was the essential feature of the Prime Contract. That is, in basic terms, the Highway along the hillside had been washed out and before the road could be repaired, the earth below the hillside needed to be stabilized with the two (2) retaining walls UMA was to design and build. Accordingly, any delay by UMA in not diligently prosecuting the work called for by its Subcontract would necessarily delay the whole Project and expose Twin K to liquidated

6

damages imposed by TDOT which in turn would obligate UMA to Twin K for those damages.

18.     As it regards meeting the completion date of November 15, 2019, for the Project, UMA had two (2) choices in arriving at its Subcontract price with Twin K. Option One was that UMA could have elected to spend the money to devote the resources to make sure it timely prosecuted the Subcontract work so as to not delay the Project past November 15, 2019, and avoid payment of liquidated damages.  Option Two was that UMA could have elected to spend less money devoting resources to a timely completion and instead budgeted for liquidated damages exposure and other damages caused to Twin K, it being less expensive to do so than Option One.

19.     When the Project got underway, it was apparent that UMA's plan was to not spend the money to devote sufficient resources to a timely completion of its Subcontract work so that the Project as a whole could be completed by November 15, 2019.

20.     Because UMA did not timely construct the retaining walls, the Project was not substantially completed until October 21, 2020 (the "**Substantial Completion Date**").  As such, the Project overran the Initial Completion Date by 339 days.  TDOT has conceded to Twin K twenty-five (25) days of excused delay such that TDOT has only assessed Twin K with 314 days of delay and has only withheld from money otherwise due Twin K just $314,000 at $1,000 per day.

7

21.     Though TDOT disagrees, Twin K agrees with UMA that TDOT has delayed the Project by an additional forty-two (42) days for which UMA should not be responsible.  Accordingly, of the 339 days of total Project delay, Twin K has conceded to UMA that UMA is not responsible for sixty-seven (67) of those days.[3]  Sixty-seven days of excused delays, albeit just between the Parties, means a new Project completion date for UMA of January 21, 2020 (the "**Revised UMA Completion Date**").  However, unless TDOT later concedes to add additional days to the Prime Contract, the remaining 272 days are the responsibility of UMA due to UMA electing to not diligently prosecute the work in order to finish any earlier.  As previously mentioned, UMA had a choice on this subject and appears to have selected "Option Two" and preferred liquidated damages exposure, and exposure to Twin K's other damages, rather than spending money to devote more resources to a more timely Subcontract completion.

22.     In the summer of 2020, it was revealed that the as-built Secondary Wall needed some additional features at each end of the wall, and so a redesign by TDOT was requested.  Unless TDOT hereafter agrees the need for the redesign is not the fault of UMA, the need for the redesign is the fault of UMA, as it was UMA that was to properly design the Secondary Wall and to properly construct it.

23.     In June 2020, UMA did cause to be prepared and submitted a proposed redesign for the Secondary Wall (the "**First Redesign**"), but this design was rejected by

---

[3] The 67 days referred to are made up of 25 days conceded by TDOT plus 42 days conceded to UMA by Twin K.

8

TDOT. Thereafter, Twin K caused to be prepared and submitted to TDOT another redesign (the "**Second Redesign**") which was approved by TDOT. Twin K incurred the engineering costs for the preparation and submittal of the Second Redesign.

24. The additional features for the Secondary Wall called for by the Second Redesign at each end of the wall can be referred to as "**Wall Wings**." Twin K incurred the costs to self-perform construction of these Wall Wings.

25. Twin K's total costs for the redesign (the "**Redesign Costs**") are itemized as follows:

| | | |
|---|---|---|
| (a) | Engineering costs with Neel-Shaffer | $ 8,500.00 |
| (b) | Additional surveying costs | $13,813.61 |
| (c) | Material for the Wall Wings | $ 9,103.76 |
| (d) | Labor & equipment to construct Wall Wings | $15,624.10 |
| (e) | Project manager | $ 2,912.00 |
| (f) | Materials and backfill | $ 6,475.35 |
| (g) | Delivery fees | $ 2,646.00 |
| | Total Redesign Costs | $59,074.82 |

26. As a result of UMA's decision to not diligently prosecute the Subcontract to meet the January 21, 2020 Revised UMA Completion Date, Twin K has been further damaged due to extra personnel time committed to the Project, its own idle equipment stationed at the Project site, and a claim for increased traffic control equipment costs from a subcontractor, International Traffic Systems. These gross costs, for the entire 339 days of Project delay, are itemized as follows:

| | | |
|---|---|---|
| (a) | Extra personnel costs | $ 77,330.84 |
| (b) | Idle Twin K equipment | $260,370.00 |
| (c) | Claim from International Traffic Systems | $ 9,967.60 |

9

Case 3:21-cv-00074-KAC-DCP   Document 1   Filed 03/08/21   Page 9 of 14   PageID #: 9

                    Gross Total                $347,668.44

Inasmuch as the gross total of $347,668.44 is for all 339 days of delay, pro-rating this gross total to just the 272 days, UMA is presently responsible for increased costs to Twin K in the amount of $278,955.20 (the "**Other Delay Costs**").[4]

27. Twin K's total costs caused by UMA referred to above are as follows:

| | | |
|---|---|---|
| (a) | 272 days of liquidated damages | $272,000.00 |
| (b) | The Redesign Costs | $ 59,074.82 |
| (c) | Other Delay Costs | <u>$278,955.20</u> |

                    Total Damages            $610,030.02

28. Section 4 of the Subcontract, at page 3, permitted Twin K to withhold from payment ten percent (10%) of money otherwise due UMA (the "**Retained Money**" or "**Retainage**") to secure UMA's performance of the Subcontract. Ordinarily, the Retainage amount would be just 5%, but UMA requested the higher percentage *in lieu* of UMA securing its performance by purchasing payment and performance bonds. In this manner, UMA would tie-up less of its bonding capacity and be able to bid more work than otherwise.

29. At UMA's request, Twin K agreed to the 10% Retainage to help UMA maximize its bonding capacity for other work. Twin K's records indicate UMA has completed $1,890,809.23 worth of work on the Subcontract. Ten percent (10%) of this amount is $189,080.92, which Twin K withheld as Retainage.

---

[4] 272/339 x $347,668.44 = $278,955.20

30. Section 3 of the Subcontract, on page 2, provides the following additional rights to further withhold sums otherwise due UMA:

> In order to secure the execution of the Subcontractor's work within the time specified, the Contractor [Twin K] shall have the right, in addition to all other rights, to supplement Subcontractor's performance and/or perform all or any portion of Subcontractor's work. Any supplemental work or work performed for, or on behalf of, the subcontractor shall be at the Subcontractor's sole expense, and Contractor shall deduct from the Contract Price all such expenses, including but not limited to liquidated damages.

Pursuant to this Section, and otherwise by law, Twin K withheld an additional sum of $167,912.86, in addition to the Retainage, to cover Twin K's losses and damages, in particular the liquidated damages Twin K has suffered as a result of UMA's failure to timely complete its Subcontract.

31. Accordingly, Twin K withheld a total of $356,993.78[5] in money otherwise due UMA as a reserve towards Twin K's anticipated damages.

32. As mentioned, Twin K's gross damages asserted by this action against UMA are $610,030.02, and to cover its losses and damages caused by UMA on this Project, Twin K withheld from payment otherwise due UMA a total of $356,993.78. Because of UMA's delay, TDOT has already withheld from Twin K $314,000 in money otherwise due Twin K as liquidated damages. Accordingly, of the money Twin K has withheld from UMA, Twin K has already reimbursed itself for 272 days of liquidated damages, or $272,000.00. Therefore, Twin K is withholding the difference, or

---

[5] $189,080.92 + $167,912.86 = $356,993.78.

11

Case 3:21-cv-00074-KAC-DCP   Document 1   Filed 03/08/21   Page 11 of 14   PageID #: 11

$84,993.78, in funds otherwise due UMA to secure compensation for Twin K's remaining damages.

33. Without waiver of its claims in this action wherein Twin K asserts UMA to be responsible for 272 days of delay and the resulting liquidated damages, the Other Delay Costs, and the Redesign Costs, Twin K reserves the right to hereafter submit a request for change order to TDOT so that additional days may be added to the Prime Contract's completion date, to be reimbursed the corresponding pro-ration of Twin K's Other Delay Costs, and to be reimbursed Twin K's Redesign Costs. Any relief granted by TDOT will be credited to UMA.

34. All prerequisites to the filing of this suit have been met. While Section 27 of the Subcontract states that the Parties shall mediate prior to filing suit, UMA declined to attend the mediation that had been scheduled for February 26, 2021, in Knoxville, Tennessee, and UMA has thereafter indicated to Twin K that it would itself be filing suit. UMA is therefore *estopped* to contend that no mediation having taken place somehow bars, or stays, this cause of action.

## IV.   CAUSES OF ACTION

### COUNT ONE:  BREACH OF CONTRACT

35. Twin K incorporates by reference paragraphs 1-34 hereinabove.

36. The Subcontract between the Parties that is **Attachment 3** constitute a contract between Twin K and UMA.

37. UMA has breached the contract by:

(a) Failing to complete its Subcontract work in sufficient time for the Project, as a whole, to be completed by the Revised UMA Completion date of January 21, 2021; and

(b) Failing to properly design and construct the Secondary Wall.

38. As a direct, proximate, and foreseeable result of UMA's breach of contract, Twin K has been damaged. Twin K's damages are as follows:

(a) Twin K has been assessed 314 days of delay at $1,000 per day by TDOT. As explained above, Twin K holds UMA responsible for just 272 days. Accordingly, UMA has damaged Twin K $272,000.00 for TDOT assessed liquidated damages;

(b) Due to the 272 delay days that are the responsibility of UMA, Twin K has incurred the various Other Delay Costs referred to hereinabove in the amount of $278,955.17; and

(c) Twin K has incurred the Redesign Costs in the amount of $59,074.82.

39. Twin K's gross damages asserted by this action against UMA are $610,030.02. Twin K has already reimbursed itself $272,000 in money withheld, and so Twin K's net damages are $338,030.02 (hereafter "**Net Damages**").

## V. DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff Twin K demands judgment against the Defendant UMA for its Net Damages, and other relief, in amounts the jury deems just and fair but not to exceed of $600,000 exclusive of interest and costs, discretionary pre-judgment interest pursuant to T. C. A. §47-14-123, discretionary costs, the clerk's bill of costs, and such

13

Case 3:21-cv-00074-KAC-DCP   Document 1   Filed 03/08/21   Page 13 of 14   PageID #: 13

further and general relief to which it may be entitled.  On any Judgement entered against UMA, UMA would receive credit for the $84,993.78 Twin K presently retains.

Plaintiff Twin K demands a jury be empaneled to try the issues joined.

Submitted this __8th___ day of __March_____, 2021.

*/s/ Brian C. Quist*
_____
Brian C. Quist,          BPR #012762
QUIST, FITZPATRICK & JARRARD, PLLC
800 South Gay Street, Suite 2121
Knoxville, Tennessee 37929-2121
(865) 524-1873
bcquist@QFJlaw.com
Attorney for Plaintiff Twin K Construction, Inc.