UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| TWIN K CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:21-CV-74-DCP |
| ) | |
| UMA, GEOTECHNICAL ) | |
| CONSTRUCTION, INC., ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| CLAY BRIGHT, in his official capacity as ) | |
| Commissioner of Tennessee Department of ) | |
| Transportation (TDOT), ) | |
| ) | |
| Third-Party Nominal Defendant. ) | |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 20].

Now before the Court is Defendant UMA, Geotechnical Construction, Inc.'s ("UMA") Motion for Partial Judgment on the Pleadings [Doc. 23]. The Motion is ripe for adjudication. Accordingly, for the reasons further explained below, the Court hereby **DENIES** UMA's Motion [**Doc. 23**].

I.   BACKGROUND

The Complaint [Doc. 1] in this matter was filed on March 8, 2021. The Complaint alleges a breach of contract against UMA and requests judgment against UMA for Twin K Construction,

Inc.'s ("Twin K") net damages in the amount of $338,020.02, among other relief [*Id.* at ¶¶ 35–39 & pp. 13–14].

Twin K is a construction general contractor performing work primarily for the Tennessee Department of Transportation ("TDOT") and other Tennessee counties and municipalities [*Id.* at ¶ 5]. Twin K states that on July 12, 2019, it was awarded a general contract from TDOT to provide emergency slope stabilization on US-70 (SR-1) in Cumberland County, Tennessee ("Project") given that the highway washed out during heavy rains that occurred in February 2019 [Id. at ¶ 6].[1]

The Complaint alleges that TDOT prepared the contract ("Prime Contract") to be bid as an "emergency contract" with all work to be completed by November 15, 2019 ("Initial Completion Date") [*Id.* at ¶ 7]. Twin K claims the initial Prime Contract price for the Project was $3,923,810.06 [*Id.*]. Twin K was issued a notice to proceed on July 26, 2019, leaving it with 112 days to complete the Project [*Id.*]. The Complaint states that for each day the Project was not completed after the Initial Completion Date, the Prime Contract provided that Twin K would be assessed $1,000 per day in liquidated damages.

Twin K alleges that the bid materials for the Prime Contract are public record and are available to prospective general contractors, as well as companies desiring to become a subcontractor [*Id.* at ¶ 9]. Twin K states that TDOT publicizes the opportunity to bid on jobs via its website [*Id.*]. Twin K attached TDOT's notification to bidders for the Project ("Notice to Bidders") [Doc. 1-1] to the Complaint. Twin K states that the Notice to Bidders indicates that bids

---

[1] The Complaint provides that the general plan for the Project was to have Twin K cause to be designed and built two (2) walls on the downhill side of the highway to provide lateral support for the highway [Doc. 1 at ¶ 8]. The first wall was to be a sloped, 45° angle soil-nail wall (the "Primary Wall"), and behind this wall, farther down the slope, was to be placed a vertical wall (the "Secondary Wall") with the area behind the Secondary Wall backfilled with crushed stone. Both walls were to be approximately 400 feet long and 23 feet high.

from general contractors for the Project were due June 21, 2019, and the completion date was listed as November 15, 2019 [Doc. 1 at ¶ 9].

The Complaint further alleges that UMA is in the business of designing and building retaining walls like the Primary and Secondary Walls in this matter [*Id.* at ¶ 10]. Twin K states that, at some point prior to June 21, 2019, UMA saw the Notice to Bidders for the Project and located and reviewed the bid documents, making UMA fully aware of the Project's scope and the Initial Completion Date [*Id.*]. Twin K contends that on June 21, 2019, UMA emailed it a solicitation to be a subcontractor for the Project and included a price quote, which Twin K attached to the Complaint [Doc. 1-2]; [Doc. 1 at ¶ 10]. UMA stated in the quote that it "has budgeted sufficient time to complete this project as described above." [Doc. 1-2 at 2]. The parties agreed that UMA would receive a subcontract from Twin K to design and build both walls [Doc. 1 at ¶ 11]. UMA executed the subcontract on September 25, 2019, and Twin K executed the same on September 26, 2019 [*See* Doc. 1-3 at 10 ("Subcontract")]. The value of the Subcontract at the time of execution was $2,273,850.00 based on the estimated quantities for the Project [Doc. 1 at ¶ 11].

The Subcontract provides, "All terms and conditions of the Prime Contract between the Owner [TDOT] and The Contractor [Twin K] are incorporated herein by reference and binding on the Subcontractor [UMA]." [Doc. 1-3 at 1]. The Subcontract further provides that:

> The Subcontractor [UMA] is bound to the Contractor [Twin K] by the terms of the Contract Documents [the Prime Contract] and assumes toward the Contractor [Twin K] with respect to the Subcontractor's [UMA] work, all of the obligations and responsibilities that the Contractor [Twin K] by the Contract Documents [the Prime Contract] has assumed toward the Owner [TDOT].

[Doc. 1-3 at 3–4]. The November 15, 2019, completion date is set forth on the cover page of the Prime Contact [*See* Doc. 1-4]. Twin K states that the liquidated damages provision of the Prime

3

Contract discussed above is TDOT's Standard Specification Section 108.09 [Doc. 1 at ¶ 14]; [*see* Doc. 1-5].

The Subcontract further provides that:

> Subcontractor [UMA] shall prosecute its work in a prompt and diligent manner in accordance with Contractor's [Twin K] Working Schedule, without delaying or hindering Contractor's [Twin K] work or the work of other contractors or subcontractors. Subcontractor [UMA] shall coordinate the work covered by this Agreement with that of all other contractors, subcontractors and of the Contractor [Twin K], in a manner that will facilitate the efficient completion of the entire work.

[Doc. 1-3 at 2]. Twin K thus alleges that UMA was obligated to diligently prosecute its work under the Subcontract in a manner that would not delay the Project's completion and that any failure to diligently prosecute resulting in delay would make UMA obligated for any liquidated damages imposed on Twin K by TDOT [Doc. 1 at ¶ 16].

Twin K claims that UMA failed to allocate sufficient resources to ensure timely completion of its duties under the Subcontract such that the Project could be completed by November 15, 2019 [*Id.* at ¶ 19]. Plaintiff relates that UMA's failure to timely construct the retaining walls resulted in the Project not being substantially completed until October 21, 2020 ("Substantial Completion Date") [*Id.* at ¶ 20]. The Project was substantially completed 339 days after the Initial Completion Date; however, Twin K states that TDOT conceded to Twin K twenty-five (25) days of excused delay, meaning Twin K was only assessed 314 days of delay, resulting in TDOT withholding $314,000 in money that would otherwise have been due to Twin K [*Id.*].

The Complaint avers that Twin K and UMA agreed that TDOT delayed the Project by an additional forty-two (42) days for which UMA should not be responsible.[2] In addition, Twin K conceded to UMA that UMA is not responsible for sixty-seven (67) of the 339 days of delay, with

---
[2] TDOT disagrees with this position [Doc. 1 at ¶ 21].

those sixty-seven (67) days encompassing both the twenty-five (25) days conceded by TDOT and an additional forty-two (42) days conceded to UMA by Twin K [*Id.*]. Twin K and UMA agreed to a new project completion date for UMA of January 21, 2020 ("Revised UMA Completion Date") [*Id.*]. However, Twin K alleges that, unless TDOT later concedes to add additional days to the Prime Contract, the remaining 272 days of delay are the responsibility of UMA because of its failure to diligently prosecute its obligations under the Subcontract [*Id.*].

The Complaint further provides that in the summer of 2020, TDOT requested a redesign of the Secondary Wall given that it needed additional features. [*Id.* at ¶ 22]. Twin K alleges that the need for a redesign of the Secondary Wall is UMA's fault, unless TDOT agrees otherwise [*Id.*]. In June 2020, UMA submitted a proposed redesign for the Secondary Wall ("First Redesign"); however, TDOT rejected this design [*Id.* at ¶ 23]. Thus, Twin K prepared and submitted a redesign ("Second Redesign") to TDOT, which was approved, and Twin K alleges that it incurred the engineering costs for the preparation and submittal of the Second Redesign [*Id.*].

The additional features for the Secondary Wall included in the Second Redesign are referred to as "Wall Wings," and Twin K states that it incurred the costs of constructing these Wall Wings [*Id.* at ¶ 24]. The Complaint provides itemized costs for the Second Redesign and states that the total redesign cost was $59,074,82 [*Id.* at ¶ 25]. In addition, Twin K claims that UMA's failure to perform under the Subcontract and meet the Revised UMA Completion Date resulted in Twin K incurring additional damages in the form of (1) extra personnel time to the Project, (2) costs of having its idle equipment stationed at the Project Site, and (3) claims for increased traffic control equipment costs from a subcontractor, International Traffic Systems [*Id.* at ¶ 26].

The Complaint includes an itemized list of the gross costs resulting from the 339 days of delay, totaling $347,669.44 [*Id.*]. Twin K alleges that pro-rating this gross total to the 272 days of

delay that it alleges UMA is responsible for results in increased costs to Twin K in the amount of $278,955.20 ("Other Delay Costs") [*Id.*]. Thus, Twin K claims total damages of $610,030.02—encompassing the $272,000.00 in liquidated damages, the $59,074.82 in redesign costs, and the $278,955.20 in Other Delay Costs [*Id.* at ¶ 27].

Twin K states that the Subcontract permits it to withhold ten percent (10%) from payment of money otherwise due to UMA ("Retained Money" or "Retainage") to secure UMA's performance under the Subcontract [*Id.* at ¶ 28 (citing [Doc. 1-3 at 3])]. Twin K claims UMA has completed $1,890,809.23 worth of work under the Subcontract, and 10% of that amount is $189,080.92, which Twin K withheld as Retainage [*Id.* at ¶ 29]. Twin K further avers that the Subcontract permits it to supplement UMA's work and/or perform all or any portion of UMA's work, and that any supplemental work performed by Twin K would be at UMA's sole expense [*Id.* at 30 (citing [Doc. 1-3 at 2])]. Twin K asserts that it is also permitted to deduct from the Contract Price all such expenses, including but not limited to liquidated damages [*Id.*]. Twin K states that it has withheld an additional sum of $167,912.86—pursuant to the Subcontract and by law—in addition to the Retainage to cover its losses and damages suffered because of UMA's failure to perform under the Subcontract [*Id.*]. Thus, Twin K has withheld a total of $356,993.78 ($189,080.92 in Retainage, plus the additional $167,912.86) otherwise due to UMA as a reserve towards Twin K's anticipated damages [*Id.* at ¶ 31].

To summarize, Twin K claims $610,030.02 in gross damages against UMA and has withheld $356,993.78 from payment otherwise due to UMA to cover its losses and damages, and TDOT has withheld $314,000.00 in money otherwise due to Twin K as liquidated damages [*Id.* at ¶ 32]. Thus, Twin K states that it reimbursed itself $272,000.00 from the money it withheld from UMA for the 272 days of delay that resulted in liquidated damages; therefore, Twin K states it

continues to withhold the difference of $84,993.78 in funds otherwise due to UMA to secure compensation for Twin K's remaining damages [*Id.*].

## II. POSITIONS OF THE PARTIES

UMA moves for partial judgment on the pleadings [Doc. 23] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and requests the Court to order Twin K to release the Retainage in the amount of $189,080.92 that Twin K has withheld. UMA argues that the Tennessee Prompt Pay Act ("PPA") requires Twin K to release the Retainage because it is UMA's property. UMA further states that pursuant to the PPA, Twin K was required to release the Retainage to UMA ten (10) days after Twin K received payment from TDOT. In addition, UMA asserts that "retainage must be paid within the time period prescribed by the [PPA] regardless of any contractual provisions otherwise allowing the withholding of such amounts as a setoff for other claims." [Doc. 23 at 2 (citing *Beacon4, LLC v. I&L Invs., LLC*, 514 S.W.3d 153, 212 (Tenn. Ct. App. 2016) (overruled on other grounds))]. Thus, UMA argues that based on the undisputed material facts, the plain language of the PPA, and the PPA's purpose of ensuring timely payment to contractors who contribute to the improvement of real property, Twin K's withholding of the Retainage due to UMA is in violation of the PPA.

Twin K responds [Doc. 28] that UMA did not meet its obligations under the Subcontract. Specifically, Twin K asserts that UMA is responsible for 272 out of the 314 days of delay, it had to finish UMA's obligations under the Subcontract, and UMA caused Twin K to incur no less than $610,032.02 in gross damages. Twin K states that the PPA allows a general contractor to make two types of payment withholdings to cover the damages/potential damages caused by a subcontractor, that UMA's right to the retained funds is expressly conditional, and that there are statutory conditions precedent for any payment of the remaining retainage to UMA.

Specifically, Twin K relies on Tenn. Code Ann. § 66-34-303, stating that it permits a general contractor to (1) reasonably withhold amounts otherwise due to the subcontractor and (2) *also* withhold a retainage. Twin K further relates that the subcontractor's interest in the retained funds is subject to the rights of the general contractor pursuant to Tenn. Code Ann. § 66-34-104(b) and that Tenn. Code Ann. § 66-34-104(e) provides that the subcontractor shall have completed all the work satisfactorily prior to receiving payment of retainage. Twin K contends that parties are to agree upon how much the general contractor keeps and how much the subcontractor is to be paid from the retainage; otherwise, pursuant to Tenn. Code Ann. § 66-34-104(f), parties are to resolve their dispute in court or by arbitration. Therefore, Twin K argues that—if there is a dispute about who owes who—the completion of the Project does not expressly mean that UMA gets paid the retainage in full. Thus, Twin K argues that UMA has conducted a selective and flawed review of the relevant PPA provisions and that the Court should deny the motion.

UMA replies [Doc. 30] that the PPA's ambiguous terms require the Court to grant its motion. UMA contends that Twin K has failed to demonstrate any legal basis to support its argument that it has the right to withhold the retained funds from UMA. Specifically, UMA asserts that Twin K's argument has no basis under Tennessee common law and that nothing in the PPA permits Twin K to withhold distribution of the retained funds because the Project achieved substantial completion in October 2020. Thus, UMA reasserts that its motion should be granted and that it is entitled to partial judgment on the pleadings.

### III. STANDARD OF REVIEW

Defendant has moved for partial judgment under the pleadings. The standard for ruling on a motion for judgment on the pleadings is the same as a motion to dismiss under Rule12(b)(6). *Sensations Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). For purposes of a

motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment. *Sun Life Assur. Co. of Canada v. Conestoga Trust Services, LLC,* No. 3:14-cv-539, 2015 WL 5714542, at *2 (E.D. Tenn. Sept. 29, 2015) (citing *J.P. Morgan Chase Bank v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). "Thus, the court will grant the plaintiff's motion if (1) the admissions in the defendants' Answer entitle the plaintiff to judgment as a matter of law, and (2) the defendants' affirmative defenses do not require factual development." *Founders Ins. Co. v. Bentley Entertainmen*t, LLC, No. 3:12-cv-01315, 2013 WL 3776311, at *8 (M.D. Tenn. July 18, 2013) (quoting *Crossville, Inc. v. Kemper Design Center, Inc.*, No. 2:09-0120, 2010 WL 2650731, at *2 (M.D. Tenn. July 2, 2010)).

IV. **ANALYSIS**

The Court has considered the parties' positions outlined above, and for the reasons further explained below, the Court **DENIES** UMA's Motion [**Doc. 23**].

The parties' dispute is straightforward. Twin K acknowledges that it kept the Retainage, stating that it was permitted to do so under the PPA. UMA disagrees, arguing that Twin K has violated the PPA by keeping the Retainage and using portions thereof to reimburse itself. Given that both parties argue that the PPA supports their position, the Court will now turn to the relevant sections of the PPA.

The PPA states that construction contracts may provide for the withholding of retainage, but it may not exceed 5% of the amount of the contract. Tenn. Code Ann. § 66-34-103(a); *Snake Steel, Inc. v. Holladay Constr. Grp., LLC,* 625 S.W.3d 830, 836 (Tenn. 2021) (explaining that the

9

PPA allows the withholding of retainage).[3] The PPA provides a timeline for when payments are due to general contractors and subcontractors as follows:

> The owner, whether public or private, shall release and pay all retainages for work completed pursuant to the terms of any contract to the prime contractor within ninety (90) days after completion of the work or within ninety (90) days after substantial completion of the project for work completed, whichever occurs first. As used in this subsection (b), "work completed" means the completion of the scope of the work and all terms and conditions covered by the contract under which the retainage is being held. The prime contractor shall pay all retainages due any remote contractor within ten (10) days after receipt of the retainages from the owner.

Tenn. Code Ann. § 66-34-103(b). The Tennessee Supreme Court has interpreted the above statute as follows:

> The Act includes deadlines for owners who withhold retainage to pay it to prime contractors after completion or substantial completion of the construction work . . . After that is done, the Act provides deadlines for prime contractors to pay subcontractors and in turn for subcontractors to pay "subsubcontractors" and material suppliers.

*Snake Steel, Inc,* 625 S.W.3d at 835. In addition, § 104(b) of the PPA provides:

> (b) As of the time of the withholding of the retained funds, the funds become the sole and separate property of the prime contractor or remote contractor to whom they are owed, subject to the rights of the person withholding the retainage in the event the prime contractor or remote contractor otherwise entitled to the funds defaults on or does not complete its contract.

Tenn. Code Ann. § 66-34-104(b). Section 104(e) provides, in relevant part:

> Upon satisfactory completion of the contract, to be evidenced by a written release by the owner, prime contractor, or remote contractor owing the retainage, all funds accumulated in the escrow account together with all interest on the account must be paid immediately

---

[3] The Court notes that the parties agreed to 10% retainage, which UMA does not address in its brief. Twin K states that the parties agreed to 10% in exchange for UMA's request that Twin K not require performance and payment bonds, which would have impacted UMA's bonding capacity. [Doc. 28 at 7]. Based on the language of the PPA, it appears that the retainage cannot exceed 5% of the contract price.

10

> to the prime contractor or remote contractor to whom the funds and interest are owed.

Tenn. Code Ann. § 66-34-104(e). Further, the PPA provides the following, specifically with respect to remote contractors:

> (a) If a remote contractor has performed in accordance with the remote contractor's written contract with the prime contractor, then the prime contractor shall pay to the remote contractor the full amount earned by the remote contractor, subject only to any condition precedent for payment clause in the contract, and less only those amounts withheld in accordance with § 66-34-303. The payment must be made in accordance with the schedule for payments established within the contract and within thirty (30) days after application for payment is timely submitted by the remote contractor to the prime contractor, in accordance with the schedule.

Tenn. Code Ann. § 66-34-302(a). A prime contractor is not prevented from reasonably withholding payment or a portion thereof to the remote contractor as long as withholding the payment is in accordance with the parties' written contract. Tenn. Code Ann. § 66-34-303. In addition, "[t]he prime contractor may also withhold a reasonable amount of retainage as specified in the written contract between the prime contractor and remote contractor; except, that the retainage amount must not exceed five percent (5%) of the amount of the contract." Tenn. Code Ann. § 66-34-303.[4]

Several courts have explained that the purpose of the PPA is "to provide timely payments to contractors, subcontractors, materialmen, furnishers, architects, and engineers and to provide for interest on late payments." *Snake Steel, Inc.,* 625 S.W.3d at 834 (quoting *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 212 (Tenn. Ct. App. 2016)) (other citations omitted). With the above authority in mind, the Court turns to the question presented in this case of whether there are any circumstances permitting the contractor to continue to withhold retainage.

---

[4] *See supra* note 3.

The Court finds the decision of the United States Bankruptcy Court for the Middle District of Florida helpful given that the court addressed a similar question pursuant to Tennessee's PPA. Specifically, in *In re Progressive Plumbing Inc.*, the court held that the general contractor did not violate the PPA when it withheld retainage from the subcontractor. No. 6:15-BK-07275-KSJ, 2019 WL 4879173, at *15 (Bankr. M.D. Fla. Sept. 30, 2019). The subcontractor argued that the general contractor violated the PPA because it did not pay the subcontractor within ten (10) days of the owner paying the general contractor, nor did it place the subcontractor's retainage into an escrow account upon receipt of the final payment from the owner. *Id.* The court disagreed with the subcontractor. *Id.*

In its decision, the court explained that the general contractor "legitimately could withhold payment or escrowing the funds because there was a valid dispute (now proven) on whether [the subcontractor] had breached the [s]ubcontract." *Id.* The court reasoned that a critical element in the case was the language of Tenn. Code Ann. § 66-34-301, entitling the subcontractor to receive payment from the general contractor if the subcontractor performed "*in accordance with such person's written contract*." *Id.* (emphasis added). In addition, the court relied on Tenn. Code Ann. § 66-34-303, finding that that the statute "particularity contemplates similar situations where a contractor withholds payment." *Id*. The court concluded:

> By the time [the subcontractor] sought its balance due under the Subcontract, [the general contractor] and [the subcontractor] were disputing, among other issues, who breached the Contract and whether [the subcontractor] was liable for [the general contractor's] labor supplementation costs and payments to other contractors under the Subcontract. There was a legitimate dispute on what payment was due under the Subcontract, and these disputes led to a five-day trial. The Court can find no violation of the Prompt Pay Act or any fault by [the general] in withholding payment or failing to escrow the $80,000. [The General Contractor] was acting within its rights under the Subcontract.

12

*Id.*[5]

In construing the relevant statutes of the PPA and the case explained above, the Court finds Defendant's request for the Court to order the immediate payment of the Retainage not well taken at this time. It appears to the Court that the PPA permits a general contractor to reasonably withhold retainage pursuant to the terms of the parties' contract, as long as such retainage does not exceed 5% and is kept in escrow until the dispute is resolved. Tenn. Code Ann. §§ 66-34-104 and 303. In construing the allegations in the Complaint as true, as this Court must do on a motion for judgment on the pleadings, Twin K alleges that UMA caused a delay of 272 days and committed other breaches of the Subcontract, thereby causing Twin K to incur significant additional costs. The Subcontract between the parties provided that if UMA was responsible for the delay, it would bear the expense of TDOT's assessment of liquidated damages against Twin K. The Court finds that, here, whether Twin K's withholding of the Retainage was reasonable pursuant to the circumstances and the parties' Subcontract is a question of fact for the jury to consider.

The Court further finds UMA's reliance on *Beacon4* unpersuasive. In *Beacon4*, the Tennessee Court of Appeals upheld the chancellor's decision, after a bench trial, that the owner of

---

[5] The undersigned disagrees with the court's conclusion that the general contractor was not required to place the retainage in escrow as Tenn. Code Ann. § 66-34-104(a) provides that retainage "must be deposited in a separate, interest-bearing, escrow account with a third party which must be established upon the withholding of any retainage." Further, § 104(i) provides, "Compliance with this section is mandatory, and shall not be waived by contract." Tenn. Code Ann. § 66-34-104(i); *see also Vic Davis Constr., Inc. v. Lauren Engineers & Constructors, Inc.*, No. E201700844COAR3CV, 2019 WL 1300935, at *10 (Tenn. Ct. App. Mar. 20, 2019) (stating that establishing an escrow for retainage is "mandatory and cannot be waived by contract") (other citations omitted). The Court observes, however, that in the bankruptcy context, as opposed to the specific issues raised here, establishing an escrow is important as it relates to the ownership of the funds. Upon establishing an escrow account, the remote contractor owns the funds subject to the rights of the prime contractor. Tenn. Code Ann. § 66-34-104(b); *In re James*, 78 B.R. 159, 162 (Bankr. E.D. Tenn. 1987) (discussing ownership of escrowed funds versus ownership of funds not in escrow and the implications thereof in the bankruptcy context).

the property violated the PPA by failing to pay the retainage it had withheld from Beacon4, the general contractor, within the statutory time frame of ninety (90) days following the issuance of the certificate of occupancy. *Beacon4,* 514 S.W.3d at 196-200, *overruled on other grounds by In re Mattie L.,* 618 S.W.3d 335 (Tenn. 2021). The court explained that the chancellor found that Beacon4 had performed in accordance with the terms of the contract and that the certificate of occupancy was issued to the owner. *Id.* at 196-97. The court noted that the question of substantial completion under the contract was a question of fact and that the evidence did not preponderate against the trial court's finding that the contract was entirely completed on a certain date. *Id.* at 198. The court concluded, "[T]he PPA requires that a retainage be paid to the contractor within ninety days of substantial completion of work or the owner's beginning to use the improvement contracted for regardless of any contractual provisions allowing the owner to reasonably withhold the sum." *Id.* at 200.

UMA asserts that the court in *Beacon4* held that it was irrelevant that the parties contracted to allow the owner to reasonably withhold the retainage. The Court notes, however, that it does not appear that the parties or the court addressed Tenn. Code Ann. § 66-34-203 (Payment Withholding or Retainage), which is the counterpart to Tenn. Code Ann. § 66-34-303 (Contractors; Withholding Payment or Retainage); *see also Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 828 n. 13 (Tenn. Ct. App. 2009) ("[N]either party addressed whether [the owner] had a right to withhold the retainage under the terms of the contract (citing Tenn. Code Ann. § 66–34–203 (Supp. 2008)). In addition, in *Beacon4*, the trial court had already found that the general contractor substantially completed its duties under the contract. *Id.* at 196. No similar finding has been made in this case at this juncture. Accordingly, the Court finds UMA's request to immediately release the Retainage not well taken at this time.

14

## V. CONCLUSION

Accordingly, for the reasons explained above, the Court **DENIES** Defendant's Motion for Partial Judgment on the Pleadings [**Doc. 23**].

**IT IS SO ORDERED**.

ENTER:

_Debra C. Poplin_
Debra C. Poplin
United States Magistrate Judge

15

Case 3:21-cv-00074-DCP   Document 74   Filed 03/23/22   Page 15 of 15   PageID #: 827