UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| TWIN K CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:21-CV-74-DCP |
| ) | |
| UMA, GEOTECHNICAL ) | |
| CONSTRUCTION, INC., ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| CLAY BRIGHT, in his official capacity as ) | |
| Commissioner of Tennessee Department of ) | |
| Transportation (TDOT), ) | |
| ) | |
| Third-Party Nominal Defendant. ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 20].

Now before the Court is Plaintiff's Motion to Limit Testimony of UMA's Expert Marvin House [Doc. 51]. Defendant filed a response in opposition [Doc. 52], and Plaintiff replied [Doc. 60]. The parties addressed the motion at the pretrial conference on March 31, 2022. Attorneys Brian Quist and Mariel Cooper appeared on behalf of Plaintiff. Attorney Joseph Gram appeared on behalf of Defendant. Attorney Joseph Watson appeared on behalf of Defendant via video conference. Attorney Melissa Brodhag appeared via video conference on behalf of Tennessee Department of Transportation ("TDOT"), a nominal party in this action. Accordingly, for the

reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion [**Doc. 51**].

I. **BACKGROUND**

Defendant retained Marvin House ("House") to render an opinion on whether the delays associated with the project were the responsibility of the general contractor, Plaintiff, or the slope reinforcement subcontractor, Defendant. House is a licensed professional engineer in many states, including Tennessee. [Doc. 51-1 at 31]. House has served as a project manager on various projects throughout the years, and he is currently the Chairman and Chief Executive Officer of Merit Construction, Inc., and the President and Owner of Professional Construction Consulting, Incorporated [*Id.*]. House is currently a member of several organizations, including Member of American Concrete Institute ("ACI"), Member of National Society of Professional Engineers ("NSPE"), the International Association of Concrete Repair Specialists ("IACRS"), and the Association of Construction Inspectors ("ACI") [*Id.* at 33].

In his expert report, House provides the project history and highlights certain portions of the parties' subcontract [*Id.* at 6]. In addition, House outlines the various discussions the parties and TDOT engaged in regarding the appropriate schedule for the completion of the work and the different schedules the parties exchanged. [*Id.* at 8]. House explains that the process of constructing a soil nailed retaining wall (the wall that Defendant was hired to build) as follows:

> Construction of a soil nailed retaining wall involves several distinct processes that must be sequenced and carefully coordinated to achieve efficient installation. The general processes of soil nailed wall construction are:
>
> 1. Excavation of a limited portion of the wall face by the General Contractor.
>
> 2. Drilling near-horizontal holes for the nails.

2

3. Inserting the steel reinforcing bars.

4. Grouting to fill the holes and encapsulate the bars.

5. Wall face prep – setting the face re-steel and vertical drain materials.

6. Applying shotcrete to the wall face (typically in two layered applications).

[*Id.* at 9].

House continues as follows:

> It is essential that the sequence and timing of these processes be controlled. Excavated wall face will fail if nailing lags far behind; holes collapse if not grouted soon after drilling; shotcrete must be applied and set before the next bench is excavated. The general contractor Twin K was responsible for all excavating on the project. The drilling, grouting, wall prep, and shotcrete are typically performed by the geotechnical contractor. The ready-mix supplier (which in this case was the General Contractor Twin K) also fills a critical role in timely delivery of shotcrete. In a well-choreographed operation, the resources assigned to each process is balanced so the wall construction moves at a fairly uniform rate without any process running ahead or lagging behind. Of course, there are many factors that disrupt this ideal flow of work, e.g., weather, poor communication, inadequate resources, unforeseen site conditions, poor bench support issues or simple lack of cooperation between parties.

[*Id.* at 9-10]. House also reviewed the daily production reports of Defendant and TDOT and opines that some of the conditions that affected production include the following:

1. The supplier of shotcrete, Twin K contributed to production delays and inefficient sequencing.
    a. Daily reports cite significant shotcrete delivery delays or non-availability on at least 10 days.

2. The bench support on numerous occasions was insufficient and not corrected by Twin K.

3. Diversion ditches were requested by UMA to control surface water and were not installed by Twin K.

3

4. UMA requested rock support numerous times for their equipment as well as concrete truck delivery. Twin K was contractually responsible for bench maintenance and site access, but was often unavailable to provide this critical support.

5. Rain and drying days accumulated throughout the project but were not added to the construction time.

[*Id.* at 10].

After reviewing the relevant documents, House opines that Defendant is not responsible for the number of delays as Plaintiff has alleged [*Id.* at 12]. House states, "Given that the UMA proposal provided on 6/21/19 was not schedule driven or date committed and only stated '. . . sufficient time to complete the project as described above,' this does not give Twin K the right to pass the contract completion requirements solely to UMA." [*Id.*]. House further opines, "It appears that Twin K 'assumed' up until February 2020 they [sic] would be granted time extensions to an emergency project, which they [sic] knew could not be completed in the time allotted by TDOT." [*Id.*]. House concludes that while Defendant was responsible for 11 days, the remaining delays were Plaintiff's responsibility [*Id.*].

In addition, House reviewed the change order that Defendant submitted to Plaintiff [*Id.* at 13]. After reviewing the project records, House opines that the second delay was Plaintiff's responsibility because Plaintiff elected to perform the added end of wall redesign work themselves and not switch traffic [*Id.* at 13]. House reasons that TDOT records show that the traffic was not shifted much until later, and therefore, Defendant could not access the area to install the upper drains [*Id.*]. House also states that there is no documentation explaining why Plaintiff delayed this work, and therefore, Plaintiff should be held responsible for the cost to hold idle equipment at the site for 113 days [*Id.*].

With respect to the issue regarding the "Secondary Wall Re-design," House states that the only reason a redesign was necessary was due to Plaintiff's poor planning of the excavation and grading, which pursuant to the subcontract, was Plaintiff's responsibility [*Id.* at 13]. House states that Defendant's design for the wall shows a taper at each end, but Plaintiff ignored the designed end of wall transitions when it excavated access ramps too close to the ends of the secondary wall [*Id.*]. House further explains that when Plaintiff excavated the site, the walls were not there, but Plaintiff was responsible for the surveying and layout of the site and should have left space for the wall transactions [*Id.*]. House summarizes a letter from Plaintiff to TDOT regarding the issues with the ends of the wall and documentation from TDOT, stating, "Twin K acknowledged during the meeting that there has been some additional excavation on the east end of the wall and their haul road was placed at the west end of the wall. This additional excavation at the wall ends resulted in altered site topography that was not accounted for on the approved wall plans." [*Id.* at 15]. House explains that Plaintiff hired an engineer firm that submitted a report stating that the "as-built contours were found to be different than the existing ground contours shown on UMA's drawings." [*Id.*]. House concludes that the delay time and costs for the redesign were not due to Defendant's design but instead incurred as a result of Plaintiff's errant excavation at the wall ends. [*Id.*].

**II.     STANDARD OF REVIEW**

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert* 509 U.S. at). Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge

> will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry is "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized

6

or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

7

### III.   ANALYSIS

Accordingly, the Court has considered the filings in this matter, and for the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion [Doc. 51].

Plaintiff raises seven (7) specific challenges to House's opinions.  First, Plaintiff argues that House provides impermissible legal opinions. Second, Plaintiff states that House provides opinions in violation of Rule 602.  Third, Plaintiff argues that House provides inadmissible parol evidence to modify the terms of the subcontract.  Fourth, Plaintiff argues that House testifies to facts that are unrelated to expert testimony.  Fifth, Plaintiff submits that House presents a factual summary pursuant to Federal Rule of Evidence 1006 that is unrelated to his expert testimony. Sixth, Plaintiff argues that House provides factual conclusions that do not require expertise pursuant to Rule 702.  Finally, Plaintiff argues that expert testimony must be relevant and reliable.

During the pretrial conference, Plaintiff argued that House simply reviewed the documents and rendered a conclusion from the facts that he reviewed.  The Court inquired as to whether Plaintiff intended to object to the entire report or just the specific portions.  Plaintiff stated that the "door should not be entirely closed" as to House's opinions.  Later, Plaintiff's counsel stated that he was careful to not request that all of House's opinions be excluded.  The Court will now turn to Plaintiff's specific objections to House's testimony.

####   1.   Legal Opinions

Plaintiff asserts that House's expert report indicates that he will provide testimony in the form of legal conclusions, such as the rights and responsibilities between the parties under the subcontract.  Plaintiff states that for example on page one of the report the word "responsibility" is a legal conclusion if House means "legal responsibility."  Plaintiff asserts that if House intends

8

to mean the fact of who delayed the project, then such is merely a factual determination, which would come from a fact witness. In addition, Plaintiff states that on page 9, subsection A, House concludes that Defendant is not responsible for 260 of the 272 claimed days of liquidated damages. Plaintiff states that House's opinion about the legal rights Plaintiff does or does not have under the contract documents should be excluded as inadmissible legal conclusions. Further, on page 10, section B, Plaintiff states that House provides a legal opinion when he states that Plaintiff is legally obligated to Defendant for its idle equipment claim of $180,255.51 based on what he says Plaintiff did or did not do. Plaintiff states that this testimony should be excluded.

Defendant states that Plaintiff has not accurately stated House's opinions. Defendant states that contrary to Plaintiff's assertion, House does not opine that Plaintiff is "legally obligated" for Plaintiff's idle equipment costs. Defendant asserts that instead, House explains why Plaintiff is responsible for the delays associated with the upper drain installation. Defendant states that each of House's opinions disputed by Plaintiff go to the cause of the delays between the parties and that his opinions address the factual circumstances that caused the project to take the amount of time to complete and how and why those circumstances existed. Defendant states Plaintiff's expert, Howard Kaleb, renders a similar opinion and that if its expert is excluded from opining to the above, Plaintiff's expert should likewise be excluded. In reply, Plaintiff maintains that House cannot offer legal conclusions.

Rule 704 allows an expert's opinion to embrace ultimate issues that will be decided by the jury. Fed. R. Evid. 704. It is well established, however, "that testimony offering nothing more than a legal conclusion—*i.e*, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). The Court finds that House may not testify that Twin K does not have the right to pass the contract

9

completion requirements solely to UMA and that House may not provide opinions with respect to the parties' contractual rights. With respect to the remaining opinions, the Court does not find that House has expressed legal conclusions, but instead, has reviewed the facts and rendered certain opinions. *See also Arrowood Indem. Co. The Lubrizol Corp. v. United States Fire Ins. Co.*, No. 1:10 CV 2871, 2016 WL 6610806, at *2 (N.D. Ohio Feb. 21, 2016) (allowing the expert to opine that the plaintiff breached a certain industry standard as long as the opinion is ancillary to the ultimate issue). For example, Plaintiff argues that House opines that Defendant is not responsible for 260 out of the 272 claimed days of liquidated damages. This is a factual opinion that will embrace the ultimate issue (*i.e.*, who breached the subcontract). Plaintiff, however, may renew its objections during trial should House's opinions be stated as legal conclusions at the trial. *See Sierra v. Williamson*, No. 4:10-CV-00079-TBR, 2013 WL 228333, at *7 (W.D. Ky. Jan. 22, 2013) ("Whether an expert's testimony embraces an improper legal conclusion often turns on the phrasing of the question posed.")

### 2. Rule 602

Plaintiff states that House opines on Plaintiff's assumptions. For instance, Plaintiff states that in House's expert report, he states, "It appears that Twin K assumed up until February 2020 they would be granted time extensions to an emergency project, which they knew could not be completed in the time allowed by TDOT." [Doc. 53 at 9]. Plaintiff states that House's statements violate Rule 602 because he cannot testify to what Plaintiff assumed or what it knew.

Defendant states that House's testimony is admissible under Rule 703 and that as an expert, House is not required to have personal knowledge upon which to base his opinions. Defendant states that House's opinions are based on the information gathered from his review of the project record and that they do not constitute speculation.

Rule 602 provides, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Rule 602, however, does not apply to expert testimony under Rule 703. Fed. R. Evid. 602.

The reason why expert testimony is not subject to Rule 602 is explained in the advisory committee notes, which state, "The reference to Rule 703 is designed to avoid any question of conflict between the present rule and the provisions of the rule allowing an expert to express opinions based on facts of which he does not have personal knowledge." Fed. R. Evid. 602. While expert testimony is not subject to Rule 602, it is subject to Rule 703, which provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

Accordingly, based on the above Rules, the Court denies Plaintiff's request at this time, but Plaintiff may renew its objection at trial if House cannot provide a proper foundation for this opinion or if such testimony is improper state-of-mind testimony. *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 765019, at *42 (N.D. Fla. Feb. 28, 2021) (expert may not opine as to what defendants knew, what they intended, or what their motives were).

### 3. Parol Evidence

Plaintiff argues that House's report indicates that he will be providing inadmissible parol evidence seeking to modify the terms of the parties' subcontract with respect to Defendant's agreement to accommodate Plaintiff's required completion date. Plaintiff asserts that the subcontract contains an integration clause and that the parol evidence is the most restrictive rule when the contract at issue is fully or completely integrated. Plaintiff states that on page seven (7)

11

of House's report, he opines on what the subcontract should have contained. Plaintiff adds House is not an expert on what provisions subcontracts should contain.

Defendant states that House's testimony does not constitute an attempt to vary the terms of the parties' subcontract and that his testimony is consistent with the language of the subcontract. Defendant explains that consistent with the language in the subcontract, the parties discussed Defendant's completion date as a part of an attempt to prepare a mutually agreeable schedule and that these discussions are what House references in his report. Defendant argues that House does not attempt to vary the subcontract terms by referencing such discussions.

In reply, Plaintiff argues that the "science" of determining what a subcontract should contain is not a recognized science for an expert to opine about, and that in the alternative, Plaintiff submits that House's proposed testimony is an attempted interpretation of the subcontract, which is inadmissible.

The Court has already ruled on Plaintiff's motion in limine to bar parol evidence and has denied that motion based on the ambiguity of the subcontract. With respect to Plaintiff's latter objection (*i.e.*, House is not an expert on contracts), the Court also finds this objection not well taken. House opines as follows: "Actual rock averaged 40 feet and based upon this and what UMA requested on 8/20/19, the schedule should have allowed 4.5 weeks per lift or 189 calendar days. Based on the logs, it was completed in 128 calendar days or 61 calendar days ahead of what UMA quoted prior to signing the contract." [Doc. 51-1 at 10]. The Court does not find such testimony is within the realm of a contracts expert. Instead, it appears that House's opinion is based on his knowledge of how long this task would take. Accordingly, Plaintiff's request to exclude this opinion is not well taken.

#### 4. Rule 1006 Summary

Plaintiff argues that in the fourth full paragraph on page six (6) of House's report, "House presents a summary of Project production summarized from TDOT daily work reports." [Doc. 53 at 13]. Plaintiff states that the parties have stipulated that the TDOT daily work reports are admissible at trial and that the summary would be admissible through a lay witness, if accurate. In addition, Plaintiff states that paragraphs 14-15 on page seven (7) of House's report references a summary of facts contained in the TDOT daily logs and from Defendant's daily logs. Plaintiff states that again, the parties have stipulated to the admissibility of the daily logs.

Defendant submits that expert witnesses are permitted to testify regarding information containing Rule 1006 summaries. Defendant explains that the facts in House's report support his opinions.

Rule 1006 provides as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

Plaintiff has not pointed the Court to any authority that holds an expert may not rely on a summary pursuant to Rule 1006. As long as House testifies that he prepared the summaries based on his review of the underlying documents, the Court will not exclude House's testimony on this basis. *See United States v. Happ*, No. CR2-06-129(8), 2008 WL 5101214, at *16 (S.D. Ohio Nov. 25, 2008) (explaining that the government's expert's testimony is admissible because the expert will be available for cross-examination regarding his preparation of his summary and the

government has already made the financial documents underlying the summary available to the defense).

5.  **Facts Unrelated to Expert Testimony and Rule 702 Testimony**

Plaintiff poses two similar objections in its brief, so the Court will address these objections together. First, Plaintiff asserts that House presents numerous facts unrelated to his Rule 702 testimony. Plaintiff argues that while a discussion of the facts on which an expert bases his/her Rule 702 opinion is permissible, House, an engineer, does not render any engineering opinions. Plaintiff argues that repeating what a fact witness will say or repeating facts lay witnesses can understand does not require specialized engineering training, knowledge, expertise, and is not expert testimony. Specifically, Plaintiff objects to the first full paragraph on page 5 through the third full paragraph on page 6. In addition, Plaintiff objects to the first two paragraphs on page 8 and to House's opinion that UMA could have been installing the upper drains on June 11, 2020, but Twin K would not let UMA back on the job, which is located at the third paragraph on page 8.

Second, Plaintiff argues that House provides several factual conclusions that do not require Rule 702 expertise. Plaintiff states that in addition to his re-presentation of the basic facts and summaries, House also makes factual conclusions from these facts that do not require specialized engineering training or expertise. Plaintiff cites to the fourth full paragraph on page six of House's report, stating that House simply looks at the Rule 1006 summary and reaches a conclusion. Plaintiff argues that House also makes factual conclusions about the delay based on his review of TDOT daily reports but that anyone can read the daily reports. Plaintiff states that other instances include Subsection B on page 10 of House's report and Subsection C on pages 10-11.

With respect to Plaintiff' first objection, Defendant argues that Plaintiff agrees House is permitted to provide the factual basis for his opinions and that the information provided by House

14

is relevant to how he analyzed the delays on the project and formulated his opinions that Defendant is not responsible for the asserted delays. With respect to Plaintiff's Rule 702 objection, Defendant argues that House's opinions are in the context of House's knowledge and experience in the proper method and sequencing of soil nail wall construction. Defendant states that if Plaintiff wants to challenge House's opinions or if Plaintiff believes House's statement of facts are misleading, Plaintiff is free to cross-examine House and object at trial.

As mentioned above, the Court must ensure that an expert's testimony "will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citing Fed. R. Evid. 702(a)). This means that an expert testimony "should address matters that are beyond the understanding of the average person." *United States v. Fed. Ins. Co.,* No. 6:20-CV-559-PGB-DCI, 2021 WL 5915833, at *5 (M.D. Fla. Oct. 22, 2021) (citation omitted). The Court has reviewed the portions of House's report that Plaintiff seeks to exclude and the parties positions thereto. While an expert may explain the facts he/she relies on (and is required to do so) to form an opinion, the Court is concerned that many of the pages in House's expert report are simply regurgitation of emails between the parties and daily production logs. In order to be helpful to the jury, House's opinions must be related to his engineering expertise. In the pages that Plaintiff has objected to, House appears to summarize the documents in this case and render conclusions based on what he has reviewed. In other words, it is not clear to the Court how House's expertise in engineering has shaped his opinions, and relatedly, how his opinions will assist the jury in understanding a fact at issue. Reading documents exchanged in this case and rendering opinions based on what the documents state is not helpful to the jury. *Henry v. Quicken Loans Inc.*, No. 2:04-CV-40346, 2009 WL 3199788, at *5 (E.D. Mich. Sept. 30, 2009) ("The magistrate judge also correctly excluded the Cohen Report on the grounds that it is based largely on evidence that could be reviewed and understood by the trier of fact,

including review of company documents . . .[and] review of emails of plaintiffs and company managers" in addition to other documents). Accordingly, the Court will sustain these objections to House's opinion.

### 6. Reliability and Relevance

Plaintiff submits that expert testimony is reliable if it is based on sufficient facts or data, (2) grounded in reliable principles and methods, and (3) applies those principals and methods to the facts of the case in a reliable manner. Plaintiff asserts that courts may also exclude experts if there is no rationale or analysis drawing a connection between the qualifications and the conclusions.

Defendant argues that Plaintiff has simply cited legal principles without any argument or discussion of House's opinions. Defendant states that in any event, given House's qualifications, his testimony satisfies both the reliability and relevancy requirements.

The Court agrees with Defendant in that Plaintiff cited legal principles without explaining how such principles apply to House's testimony. The Court, however, has considered these principles in rendering the instant Order.

## IV. CONCLUSION

Accordingly, for the reasons explained above, Plaintiff's Motion to Limit Testimony of UMA's Expert Marvin House [**Doc. 51**] is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

ENTER:

_____
Debra C. Poplin
United States Magistrate Judge